**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 13a0983n.06**

**No. 12-6436**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Nov 14, 2013<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| RICO DEVAUGHN TILLMAN, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| Defendant-Appellant. | ) | DISTRICT OF KENTUCKY |

**O P I N I O N**

BEFORE:    SILER, COLE, and COOK, Circuit Judges.

COLE, Circuit Judge.  Defendant-Appellant Rico Tillman attempts to suppress evidence flowing from a *Terry* stop and frisk.  Because this case arose in connection with a valid traffic stop, the only issue on appeal is whether Deputy Jesse Delaney's frisk was justified by a reasonable suspicion that Tillman was armed and dangerous.  Deputy Delaney stopped Tillman because he was not wearing a seatbelt, in contravention of K.R.S. § 189.125.  During the stop, Tillman's conduct led Delaney to believe he was armed and dangerous.  After ordering Tillman out of the car and conducting a pat-down, Delaney recovered oxycodone and xanax pills, a set of brass knuckles, a cell phone, and about $2,800 in cash.  Claiming that the frisk violated his Fourth Amendment rights, Tillman moved to suppress this evidence and other contraband discovered in the car.  The district

court denied the motion. We affirm, concluding that the pat-down did not violate Tillman's right to be free from unreasonable searches or seizures.

## I. BACKGROUND

**A.    The Facts**

On the afternoon of February 27, 2012, Deputy Delaney approached a red traffic light and noticed in his rear view mirror a maroon Honda Accord. Tillman was driving the car, although his girlfriend, Charlie Angell, owned the vehicle. Delaney recognized this particular Honda because he had pulled Angell over several times before in the same vehicle. Delaney also knew that Angell and her previous boyfriends had been arrested for drug offenses in the past. As Delaney continued to observe Tillman in his rear view mirror, he noticed that Tillman was an African-American male with "penitentiary-type" tattoos on his face and found it "suspicious" that Tillman avoided direct eye contact. Before the traffic light turned green, Delaney decided to stop Tillman for operating a motor vehicle without a seatbelt. *See* K.R.S. § 189.125. To effectuate the stop, when the light changed, Delaney slowed down to thirty-five miles per hour so Tillman would pass him.

*1. The Stop*

Once Tillman had pulled over in the emergency lane, Delaney reached for his radio to call in the stop, the license plate, and the description of the vehicle. However, Delaney's attention was diverted from this task because Tillman "quickly" reached over to the front passenger side of the car, disappearing from Delaney's sight. According to Delaney, this type of movement indicates that a driver is grabbing a weapon to confront the officer, hiding a weapon or contraband, or obtaining registration information. But based on his training and experience, an officer can usually see the

head of a driver reaching in the glove compartment to obtain registration documents. Delaney accordingly ruled out the possibility that Tillman's movements were innocuous. His suspicions were amplified when Tillman, for a second time, reached over to the passenger side of the car. Delaney considered two alternatives: either Tillman had second thoughts about grabbing a weapon the first time, or he was unable to grab a weapon on the first attempt but was determined to succeed on the second try. Tillman's conduct prompted Delaney to exit his car and approach the Honda with his handgun drawn, but with the weapon out of Tillman's view.

After Delaney identified himself and indicated the reason for the stop, he saw that Tillman did not have his license or registration in his hands. Immediately Delaney directed Tillman to place both hands on the steering wheel. Tillman initially complied, but then, according to Delaney, he "nervously" moved his left hand off the steering wheel and placed it on his left pant pocket. Delaney, for a second time, ordered Tillman to keep his hands in plain view and asked him whether there were any drugs or weapons in the car. Tillman refused to answer. Beads of sweat began to form on his forehead, and Delaney found it strange that Tillman was profusely sweating although it was fifty-five degrees outside. Once again, Tillman lowered his left hand off the steering wheel and down to the left side of his body. At least three times Delaney instructed Tillman to keep his hands in plain sight. Delaney testified, "no matter what I told him, he could not keep his hands [on the wheel]."

*2. The Frisk*

Fearing for his safety and under the belief that Tillman was armed and dangerous, Delaney ordered Tillman out of the car and frisked him. Delaney recovered four 30 mg oxycodone tablets, three-and-a-half xanax bars, a set of brass knuckles, $2,870 in cash, and a cell phone from Tillman's person. The cell phone contained a text message to Charlie Angell stating "I've been hit." Angell responded, "You shouldn't have left without me the car is hot don't let them search." Tillman was arrested for possession of a controlled substance in the first and third degrees and carrying a concealed deadly weapon. A search warrant executed for the car revealed a tan purse in the front passenger side floor-board containing about fifty-seven grams of cocaine, a loaded .45 caliber Taurus semi-automatic handgun, and an additional $5,400 in cash.

**B.   Procedural History**

Tillman moved to suppress all evidence stemming from the *Terry* frisk. After an evidentiary hearing, the district court denied his motion, concluding that Tillman's Fourth Amendment rights had not been violated. Thereafter, Tillman pled guilty to possession with intent to distribute oxycodone, possession with intent to distribute cocaine, and possession of a firearm in furtherance of drug trafficking, but he reserved the right to appeal the district court's denial of his suppression motion. Tillman was sentenced to 162 months of imprisonment and to six years of supervised release. On appeal, he argues that the district court erred in denying his motion. We have jurisdiction to review the court's decision under 28 U.S.C. § 1291.

**II. ANALYSIS**

**A.    Standard of Review**

An appeal of a district court's denial of a motion to suppress presents a mixed question of law and fact. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010). We review the denial of a motion to suppress de novo, but we will accept the district court's factual findings unless they are clearly erroneous. *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006). A factual finding "is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006). In addition, this court must consider the evidence in a light most favorable to the government, as it was the prevailing party in the district court. *Garrido*, 467 F.3d at 977.

**B.    Legality of the Initial Traffic Stop**

The Fourth Amendment protects citizens against unreasonable searches and seizures; this protection extends to brief investigatory stops of vehicles that fall short of a traditional arrest. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). A stop and frisk is constitutionally permissible if there is a proper basis for the stop and if the officer reasonably believes that the person stopped is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). We first consider the reasonableness of the traffic stop and then determine whether Delaney had reasonable suspicion to frisk Tillman.

This court has consistently held that if an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); *see United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) (holding stop for failure to wear seatbelts constitutional);

*United States v. Hill*, 195 F.3d 258, 267 (6th Cir.1999) (holding stop for failing to signal lane change constitutional); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (finding it reasonable for an officer to stop a vehicle whose driver has just committed a traffic violation). In the present case, there was a legitimate basis for the stop because Delaney observed Tillman not wearing a seatbelt, in violation of K.R.S. § 189.125. Indeed, Tillman does not challenge that violating a traffic law can provide the basis for a lawful stop.

His sole argument attacking the validity of the stop is that it was a pretext for a narcotics or weapons search. There is no question in Tillman's mind that Delaney was suspicions because Tillman is a "black man with tattoos on his face." Delaney testified that he did not recognize Tillman and presumed that he was affiliated with a gang or served time in prison. But an officer's "actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008). While the Constitution precludes selective enforcement based on factors such as race, the cause of action for that violation is grounded in the Equal Protection Clause, not the Fourth Amendment. *Id.* Tillman has not raised an Equal Protection claim, and he cannot take refuge in the Fourth Amendment to support his argument that the stop was pretextual.

## C.     Legality of the *Terry* Frisk

A valid stop does not necessarily grant an officer the authority to perform a pat-down search. *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005). Instead, to proceed from a stop to a frisk, an officer must have a reasonable suspicion that the person to be searched is armed and dangerous. *Johnson*, 555 U.S. at 326–27. Reasonable suspicion requires that an officer have

"articulable reasons and a particularized and objective basis" for assuming criminal activity is afoot. *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003). Absolute certainty is not required to justify a frisk; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Tillman argues that once he was lawfully seized for the seatbelt violation, Delaney lacked reasonable suspicion to believe he was armed and dangerous. The district court disagreed. Finding Delaney's observations to be "more than sufficient" to uphold the pat-down, the court concluded that Tillman's conduct could "lead a reasonably prudent person in the same circumstances to believe that his safety was in danger." We hold that Tillman's actions generated the requisite reasonable suspicion for Deputy Delaney to perform the frisk.

Several reasons compel this conclusion. First, Tillman did not comply with Delaney's orders to keep his hands in plain view; second, his furtive movements were consistent with hiding or obtaining a weapon; third, Tillman was sweating and his voice was shaky; and fourth, he was driving the car of a known drug dealer. We address each of these facts individually, but construe them—as we must—based on the totality of the circumstances. *DeWitt*, 341 F.3d at 443.

*1. Tillman did not follow Delaney's orders to keep his hands in plain view*

We give significant weight to the fact that Tillman refused to heed Delaney's instruction to keep his hands on the steering wheel. In *Adams v. Williams*, 407 U.S. 143, 148 (1972), a case also involving a *Terry* stop, the officer ordered the defendant to step out of the car so he could see the defendant's movements more clearly. *Id.* The defendant ignored the officer's order, and this provided ample reason for the officer to fear for his safety. *Id. United States v. Bohannon* is also

instructive. There, a suspect acted "nervous" and twice ignored the officer's request to keep his hands in plain view. *United States v. Bohannon*, 225 F.3d 615, 618 (6th Cir. 2000). We explained in *Bohannon* that it was reasonable for the officer to pat down the suspect to search for weapons. *Id.* Without question, officers must ensure that a suspect's arms and hands do not pose a safety risk to them or others. *Street*, 614 F. 3d at 233. On balance, our cases suggest that when a suspect's movements cannot be observed by the officer and the suspect does not listen to orders, the risk of danger rises, making a decision to frisk reasonable under the circumstances.

Delaney testified that Tillman "wouldn't obey my simple command of keeping his hands where I could see them, and it was making me uncomfortable . . . . There was something that concerned him so much near his leg . . . ." Consequently, Delaney was "fearful that [Tillman] had a weapon on him." The district court found Delaney's testimony to be credible, and we must defer to the court's credibility determination because it was in the best position to make this assessment. *Garrido*, 467 F.3d at 977. Because Tillman repeatedly failed to keep his hands on the steering wheel, Delaney's concern for his safety was not only objective and particularized, but also warranted under the circumstances.

*2. Tillman made two furtive movements*

This court has held that an officer's observation of a defendant reaching under the seat in addition to other factors can create reasonable suspicion to justify a *Terry* frisk. *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007). In *Graham*, an officer saw the defendant dip his shoulder, as if he were putting something under the seat. As we explained in that case, this type of "furtive movement" is consistent with an attempt to conceal a weapon. *Id.* Similarly, in *United*

*States v. Campbell*, when officers conducted a traffic stop, they observed the defendant slouch down with his hands out of sight, suggestive of hiding a weapon. 549 F.3d 364, 372 (6th Cir. 2008). The pat-down in *Campbell* was lawful because a reasonably prudent person in this situation would have been justified to believe his safety was compromised. *Id.* at 373.

In this case, Tillman "quickly" reached over to the passenger side of the car two times, which could have indicated that he was grabbing a weapon. He claims, however, that merely reaching across the seat was an insufficient basis for Delaney to believe he was armed and dangerous. But Tillman overlooks the fact that innocent conduct, when examined in its totality, can support a finding of reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Traffic stops are "fraught with danger to police officers"; they must often make split-second decisions, frequently on the basis of incomplete information. *Michigan. v. Long*, 463 U.S. 1032, 1047 (1983). Even if Tillman had a legitimate reason for reaching toward the passenger side of the car, his movements reasonably caused Delaney to be concerned for his safety, especially since Delaney was the sole officer at the scene. *United States v. Bost*, No. 3:11–CR–139, 2012 WL 2865895, at *15 (E.D. Tenn. May 3, 2012) (finding that after the defendant put his hand out of the officer's view, it was a reasonable precaution for the officer, who was alone at the scene, to pat him down). Tillman's furtive movements are particularly unsettling because he reached over to the passenger side of the car twice, and his actions were inconsistent with a driver obtaining his licence or registration. If Tillman had his license or registration in his hands when Delaney approached the car, presumably this would have diffused the threat that Tillman procured a weapon when he reached over to the passenger side of the car.

### 3. Tillman was nervous

"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  Because a certain level of nervousness may be expected during encounters with the police, it is insufficient, by itself, to find reasonable suspicion. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995).  Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal citations omitted).  Delaney did just that.

Relying on his training, Delaney found several behaviors to be suspicions: Tillman was sweating profusely despite mild temperatures, he would not make direct eye contact with Delaney, and his voice was shaky.  Tillman claims he was sweating because Delaney had his gun drawn and he feared Delaney would "blow his brains out."  This claim is not supported by the record.  Delaney testified that when he approached the car Tillman was driving, he placed his weapon out of Tillman's view.  Thus, there is no evidence to suggest that Tillman was aware of Delaney's weapon prior to the frisk.

### 4. Tillman was driving the car of a known drug dealer

Delaney recognized that the car Tillman was driving belonged to Charlie Angell, who had been arrested for drug offenses in the past.  Although association with a known criminal alone is not enough to provide the basis for reasonable suspicion, *Sibron v. New York,* 392 U.S. 40, 73 (1968)(Harlan, J. concurring),  here there was more.  Tillman disobeyed multiple commands to keep

his hands visible, made two furtive movements, and was nervous.  His conduct, when examined cumulatively, provides an adequate basis to find reasonable suspicion.

In short, the important question is "whether a reasonably prudent man in the circumstances" could have believed "that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.  We are satisfied, as was the district court, that the combined circumstances in this case were based on objective and articulable facts to support Delaney's belief that Tillman was armed and dangerous.

### III.  CONCLUSION

For these reasons, we affirm the district court's order denying Tillman's motion to suppress.