**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0261n.06

Case No. 14-6385

**FILED**
May 12, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JERIS COKER, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BOGGS, SUTTON, and COOK, Circuit Judges.

SUTTON, Circuit Judge. An otherwise routine traffic stop turned into a criminal investigation when a police officer suspected that the driver, Jeris Coker, had drugs or guns in his car. The investigation uncovered that Coker was a felon in possession of a handgun—evidence that led to Coker's guilty plea and 37-month prison sentence. Was the investigation leading to that discovery constitutional? Yes, we hold, and thus affirm.

Whether the Fourth Amendment allowed the officer's investigation turns on what happened during Coker's forty-minute traffic stop late at night in rural Tennessee. A dash-cam video, suppression-motion testimony, and a magistrate judge's findings of fact (adopted by the district court) lead us through the encounter. Here is our account of what they show happened, followed by our analysis of the constitutionality of the stop at each stage.

2:44–2:47 AM: Late at night in Rockford, Tennessee, Officer Reginald McCullough observed a car cross the double-yellow centerline several times, including while making a turn. McCullough activated his lights to pull the car over, and after about twenty seconds, the driver complied. McCullough too pulled over and approached the car on foot. The driver identified himself as Jeris Coker.

Okay so far? Yes. McCullough had probable cause to stop the car because Coker violated "run-of-the-mill traffic laws." *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). McCullough personally witnessed Coker violate (at least) one provision of the Tennessee Code: § 55-8-140(2) (which prohibits crossing a double-yellow centerline when turning). That gave him probable cause to stop Coker. *See Whren v. United States*, 517 U.S. 806, 810, 819 (1996); *United States v. Graham*, 483 F.3d 431, 437 (6th Cir. 2007).

The stop did not end there, however.

2:47–2:52 AM: After asking some routine questions and hearing Coker's answers, McCullough returned to his patrol car to call in the stop and write a traffic ticket. While there, McCullough observed Coker intensely staring at him from his car, which he considered unusual behavior based on the hundreds of similar stops he had performed in his career. McCullough also became concerned with Coker's movements in the car, including his "leaning forward" and "reaching into the backseat." R. 23 at 15.

2:53 AM: This behavior prompted McCullough to return to Coker's car. As he approached, he asked Coker to put his hands out the window. Coker complied. "Why are you moving around so much?" McCullough asked. To ash a cigar, Coker answered. Coker admitted that he was nervous, but said it was because he didn't want any more points on his license. McCullough instructed Coker to quit "digging around and moving around" as he returned to his car.

2:54–2:55 AM: Back at the patrol car, McCullough explained to a ride-along citizen that he had become suspicious because Coker was "nervous as hell" and driving so late at night. As Coker "continu[ed]" to move around, McCullough's suspicions continued to rise. R. 23 at 16. After learning from dispatch that Coker was "clear[]" of outstanding warrants, *id.*, McCullough had to decide whether to finish the ticket or extend the stop.

2:55–3:00 AM: McCullough decided to extend the stop to "investigate a little bit." R. 19 at 87. He asked Coker questions relating to drugs, including whether a drug dog would alert near his car. It "shouldn't," Coker responded, but he admitted that he had been around "weed smoke" in the past and that drug dogs had alerted to his car before. McCullough attempted to obtain Coker's consent to search the car but Coker refused. McCullough decided to call for a drug dog.

Still okay? Yes, but this is a closer call. McCullough had authority to detain Coker until the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). McCullough reasonably should have completed these tasks by 3 AM or so. *See id.* at 1614–15. By that time, he had obtained all of Coker's information, received the all-clear from dispatch, and could have presumably finished writing the ticket. Unrelated to those tasks, McCullough chose to extend the stop to investigate for "ordinary criminal wrongdoing," a decision that needed to be supported by "reasonable suspicion." *Id.* at 1615–16 (quotation omitted).

It was. Reasonable suspicion is not a high bar. *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014). Although more than a "mere 'hunch'" is required, *id.* (quotation omitted), the officer needs only "a minimal level of objective justification" for the stop, considering the "whole picture" around him. *Illinois v. Wardlow*, 528 U.S. 119, 123, 127 (2000). The inquiry has no "neat set of legal rules" but instead focuses on commonsense inferences from what happened. *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996) (quotation omitted).

Three features of this encounter taken together gave McCullough reasonable suspicion to extend the stop. *First* (and most important) were Coker's suspicious movements—"leaning forward," "reaching into the backseat," and "digging around" in the car, after being told to stop moving. R. 19 at 57; R. 23 at 15; Video at 2:53:59–2:54:01. "[I]n the normal traffic stop," McCullough testified, "it [is not] common for people to keep moving around and digging around in their vehicles"—"especially after being asked not to." R. 19 at 99–100. All of this movement meant that "[Coker] could have been looking for a weapon" or "hiding a weapon. [Or] [h]e could have been hiding drugs." *Id.* at 99. That is why this court and others have concluded that these kinds of movements in a car (in combination with other factors) may provide an officer

with reasonable suspicion of ongoing criminal activity. *E.g.*, *United States v. Carr*, 674 F.3d 570, 572, 574 (6th Cir. 2012) ("bending toward the middle console"); *United States v. Campbell*, 549 F.3d 364, 369, 371 (6th Cir. 2008) ("slouch[ing] down . . . with his hands out of sight"); *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) ("[a] dip with his right shoulder toward the floor"); *United States v. Bailey*, 302 F.3d 652, 659 (6th Cir. 2002) ("reaching"); *see also, e.g.*, *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) ("stuffing movements toward the seat"); *United States v. Bell*, 480 F.3d 860, 862, 864 (8th Cir. 2007) ("reach[ing] back"). Of importance here, Coker's movements were more suspicious than the movements in many of these cases because Coker *continued* to move even after being told not to do so. *See United States v. Mays*, 643 F.3d 537, 540–43 (6th Cir. 2011); *see also United States v. Holmes*, 385 F.3d 786, 789–90 (D.C. Cir. 2004) (Roberts, J.).

*Second* was Coker's nervousness. Even the most routine encounters with the police can be nerve-racking, we understand. But acting *more nervous* than the average person in a traffic stop, as Coker did, legitimately may increase an experienced officer's suspicions. *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 3, 9–10 (1989); *United States v. Winters*, 782 F.3d 289, 292, 299 (6th Cir. 2015). And it did here.

*Third* was Coker's travel time—around 2:45 AM. While this factor does not by itself establish reasonable suspicion, it matters in "the reasonable suspicion calculus." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006); *see Wardlow*, 528 U.S. at 124. Conduct relatively benign in the light of day may pique one's suspicions in the dark of a late night, particularly when there is no other explanation for the late-night driving (*e.g.*, working as a truck driver). *Cf. Ornelas*, 517 U.S. at 699–700.

Each of these facts, to be sure, may well be "consistent with innocent travel." *Sokolow*, 490 U.S. at 9. But we do not employ a "divide-and-conquer analysis" for each thing an officer witnesses. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). We instead treat the whole as greater than (or at least equal to) the sum of its parts.

Coker counters that the district court (and magistrate judge) exaggerated his continuous and "excessive movement[s]," which are not evident in the video either way and have been disputed from the start. Appellant's Br. 34. Coker properly focuses on this fact, which is crucial to the outcome. Without it, McCullough would not have had reasonable suspicion to extend the stop. But we cannot ignore it or for that matter discount it. Those closer to the stop, *witnessing* the events rather than reading about them on a computer screen, have already determined the facts. Coker "continually" moved around, they say, including by "reaching into the backseat." R. 23 at 15–16. We may not second-guess this finding of fact unless it rises to the level of clear error. *United States v. Terry*, 522 F.3d 645, 647 (6th Cir. 2008). It does not. McCullough testified that Coker continuously "mov[ed] around within the vehicle" as if he were "looking for something" or "trying to hide something." R. 19 at 56. This included "digging around" and "reaching around in the back." *Id.* at 57, 99; Video at 2:53:59–2:54:01. McCullough said the same things on the night of the stop. Respecting the perspectives of those closest to the scene, *see Ornelas*, 517 U.S. at 699–700, and "review[ing] the evidence in the light most likely to support the district court's decision," *Winters*, 782 F.3d at 301 (quotation omitted), we must accept this finding of fact. Doing so means McCullough had reasonable suspicion to extend the stop and investigate further. And that is what he did.

> 3:00–3:05 AM: From the patrol car, McCullough (again) observed Coker move around. By now fearing for his safety, McCullough asked Coker to get out of the car so he could perform a pat-down search for weapons. Either right before or right after starting the pat-down (the video is unclear), McCullough asked Coker for consent to check his pockets.

"Go ahead, sir," Coker replied. McCullough did so and finished the pat-down, finding an empty gun holster on Coker's hip. He then handcuffed Coker.

To justify this pat-down, McCullough needed a special kind of reasonable suspicion: reasonable suspicion not that Coker was engaged in *generic* criminal activity (which, as explained, he had) but reasonable suspicion *specifically* that Coker was "armed and dangerous." *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009). He had that too. Above all, Coker would (still) not stop digging around despite McCullough's repeated admonitions to stop. Coker could have grabbed his gun during any of this digging. *See United States v. Bohannon*, 225 F.3d 615, 618 (6th Cir. 2000); *United States v. Tillman*, 543 F. App'x 557, 561 (6th Cir. 2013). Coker's intense staring, nervousness, and travel time didn't help his cause either. *See United States v. Oliver*, 550 F.3d 734, 738–39 (8th Cir. 2008); *cf. United States v. McMullin*, 739 F.3d 943, 946 (6th Cir. 2014). McCullough could thus constitutionally perform a pat-down search of Coker.

At this point, a handcuffed Coker awaited the drug dog's arrival. Coker does not challenge what happened next, making the remainder of the encounter (legally) anticlimactic.

3:06–3:19 AM: After handcuffing Coker, McCullough began looking around the outside of the car. He also continued to fill out the original traffic ticket, completing it and time stamping it at 3:10 AM. He then stood around waiting with Coker.

3:19–3:28 AM: The drug dog arrived with another officer. The dog swept around Coker's car and alerted at 3:24 AM. The officers then searched the car, finding a gun.

The trained drug dog's alert gave the officers probable cause to search the car, and that search resulted in the critical evidence to convict Coker: the loaded gun. *See Florida v. Harris*, 133 S. Ct. 1050, 1059 (2013). Coker does not make any argument about the duration of the stop—about thirty-nine minutes from the initial stop to the drug-dog alert. Nor could he. We have approved a nearly identical timeline in a traffic stop involving reasonable suspicion and a drug dog. *United States v. Davis*, 430 F.3d 345, 354–55 (6th Cir. 2005). All points considered,

6

the seizure—from the initial traffic stop to its extension to the pat-down to the ultimate search of the car—was constitutional. The district court thus correctly denied the motion to suppress the evidence.

For these reasons, we affirm.